## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ELUID VILLARREAL

     Plaintiff,

v.

WALMART INC.

     Defendant.

---

## COMPLAINT

---

Eluid Villarreal, through his attorney, Paul Maxon, brings this lawsuit for disability discrimination and retaliation. His allegations are as follows:

## JURISDICTION AND VENUE

1. Plaintiff Eluid "Gil" Villarreal is a Colorado resident who lives in Aurora, Colorado. At all relevant times, he was a resident of this state.

2. Defendant is a Delaware corporation that regularly conducts business within the State of Colorado.

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1332 and 1343, and this action is authorized and instituted pursuant to 29 U.S.C. § 626(c).

4. Venue is proper in this Court as the unlawful employment practices alleged were committed within the jurisdiction of the United States District Court for the District of Colorado.

## **FACTUAL ALLEGATIONS**

5.   Mr. Villareal has been a high performing employee for Defendant for 24
     years. Until March 2018, all his  performance reviews were positive. In early
     2017, he was given an Outstanding Service Award for his 20 years of work
     with Defendant. At approximately the same time, the Company rated him as
     a "Solid Performer" on his annual review for his position as Fresh Assistant
     Store Manager.

6.   Unfortunately, Mr. Villarreal suffesr from hypoxia, diabetes, chronic
     obstructive pulmonary disease, and hernia, all of which Defendant is aware.

7.   On June 24, 2017, while working at Defendant's Aurora location, Mr.
     Villarreal suffered an incarcerated umbilical hernia. The condition was life
     threatening, and required surgery, but Defendant's insurance company,
     which Defendant owns, took 30 days to approve the procedure.

8.   On July 7, 2017, while on medical leave related to his hernia, Mr. Villarreal
     was called by Defendant's employee Eric Krause and told that he was being
     replaced.

9.   Mr. Villarreal returned to work on approximately September 23, 2017, with
     restrictions related to his surgery—he had to use a wheel chair while
     working and needed to use oxygen. When Defendant learned of these
     restrictions it moved him into the apparel department, and attempted to
     place him on the overnight shift. On his first day back, when he informed his
     supervisor Rob Novaro that he was on medication, Defendant sent him
     home.

10. On September 24, 2017, the day after Mr. Villarreal returned to work, Defendant's Human Resource Manager Lisa Stanco accused him of "coming and going as you please," and of having poor attendance. On September 26, he complained to her that he believed that these actions were being taken against him for having been injured on the job and taking medical leave.

11. On approximately November 4, 2017, two weeks after Mr. Villarreal complained about discrimination, he was asked by Mike Hedges, Defendant's Store Manager, to tour the ladies wear department. Mr. Villarreal explained that he could not tour at that time because he was running low on oxygen. Nevertheless, Mr. Hedges forced Mr. Villarreal to tour the department, causing him to run out of oxygen. When this happened, he informed Hedges that he needed to end the tour, but Hedges would not permit it. As a result, Mr. Villarreal lost consciousness and fell out of his wheelchair. Defendant did not call an ambulance, and Mr. Villarreal drove himself to the hospital.

12. Despite these medical challenges, Mr. Villarreal continued to perform his job well. In December 2017, Defendant moved him back into the Fresh Department, because it had done poorly in his absence. After his reassignment, Mr. Villarreal received immediate positive feedback regarding his performance. For example, on December 17, 2018, he was told by the Defendant's Operations Manager Ryan Nylander that his produce area "Looks awesome." This feedback was consistent with that which Mr.

Villarreal received from numerous other supervisors, including Defendant's Food Manager, Mike McClain, and Defendant's Vice president, David Carmen, all of whom told Mr. Villarreal that his performance was strong.

13. In late March 2018 Mr. Villarreal was given his annual review for 2017. Although he had been told by his supervisors that his performance was strong, he was given an overall rating of "Development Needed." The 2017 review was the first time in Mr. Villarreal's 20 plus years with Defendant that he had been given a negative rating on his annual review. 2017 was also the year that he took the most medical leave, and the only one when he had to work with restrictions.

14. At approximately the same time that Defendant gave Mr. Villarreal this negative review, the company forwarded him the profit and loss statements for his department. They showed that his department was the most profitable in the region.

15. On March 30, 2018, Mr. Villarreal complained to Michael Hedges that the review was discriminatory based on his disabilities and on the job injury. Shortly thereafter, Mr. Hedges told Mr. Villarreal that he did not have any "results," even though his department was the extremely profitable.

16. On April 8, 2018, Mr. Villarreal had to leave work early because he was out of oxygen. However, Defendant's manager Kathleen Greer told him that he could not leave because he had exhausted his available sick time.

17. On approximately April 12, Defendant wrote Mr. Villarreal up for having 12 "outs" (items not in stock) in 3 days. Managers in other departments had

hundreds of outs, but received no write ups. That same day, Defendant's Divisional Vice President told Mr. Villarreal that his department looked "amazing".

18. On April 13, 2018, Mr. Villarreal was informed by his supervisor Mike Hedges that he needed to hire more people for his department in order for it to function properly. Mr. Hedges agreed and authorized Mr. Villarreal to do so. However, in the subsequent months, whenever Mr. Villarreal hired someone, they were placed into a different department in a deliberate attempt by Defendant's management to understaff his department to hinder his performance.

19. On April 18, 2018 Mr. Villarreal complained that Defendant's interference with his hiring was discriminatory. The following day he was yelled at by Mr. Hedges in front of co-workers.

20. On April 22, 2018, Mr. Villarreal made another complaint of discrimination, this time to Katherine Greer, Defendant's Manager. Approximately two weeks later Mr. Villarreal learned that he was the only manager in the store removed from the "Grid," the whiteboard that assigns managerial duties.

21. In addition, at various times during April and May 2018, Mr. Villarreal was excluded from managerial meetings, not offered trainings that other managers were given, had his supervisors discuss his medical conditions in front of co-workers, denied wheelchair access to parts of Defendant's store, and was scheduled to work at times when he had requested time off for doctor's appointments.

22. On June, 7, 2018, Mr. Villarreal filed a charge of discrimination with the EEOC against Defendant, alleging disability discrimination and retaliation.

23. On June 12, 2018 Defendant denied Mr. Villarreal time off for a medical procedure. That same day, Mr. Hedges yelled at Mr. Villarreal on the sales floor, and continued excluding Mr. Villarreal from departmental meetings.

24. On June 13, 2018, Mr. Hedges and Ms. Greer informed Mr. Villarreal that, going forward, he had to have his section of the store set up by 4:00 A.M., instead of 9:00 A.M. In Mr. Villarreal's 20 plus years working for Defendant, this was the first time it had required him to have his area prepared by that time.

25. On June 14, 2018, Mr. Villarreal was placed on lifting restrictions by his doctor and provided documentation of that restriction to Defendant.

26. On June 15, 2018, Mr. Hedges yelled at Mr. Villarreal for not having his area set up by 4 A.M. That day, Mr. Villarreal's attorney sent Mr. Hedges and Defendant's human resources representative Molly Donahue a cease and desist letter, specifically invoking the Americans with Disabilities Act ("ADA").

27. On June 18, 2018, Mr. Villarreal attended a doctor appointment. Shortly after his return, he was given negative performance feedback by Defendant's manager J.J. Caro, regarding alleged stocking deficiencies. Mr. Villarreal's co-workers had many more substantial deficiencies, but did not receive similar feedback.

28. On June 23, 2018, Mr. Villarreal  learned that Defendant changed his schedule to require him to work on July 3, despite the fact that he had informed the company that he had a family obligation that day, and had been approved for time off. Later on the 23rd, he went to use his wheel chair, and discovered that it had been unplugged and was uncharged and inoperable. After work, when he returned to his vehicle in Defendant's parking lot, he discovered that his tail lights had been smashed.

29. On June 24, 2018, Mr. Villarreal's  doctor placed him on additional work restrictions, requiring him to use a wheelchair. Later that day, he was told that he had to park his wheelchair in a maintenance closet that was infested with mice.

30. On June 26, 2018, Defendant scheduled Mr. Villarreal  to work from 3 P.M. until 3 A.M. The next day, his attorney sent another cease and desist letter to Defendant, again invoking his rights under the ADA.

31. On July 3, 2018 (the day Mr. Villarreal had requested off) Mr. Hedges did a store tour with all other store managers except Mr. Villarreal. On the 10th, Mr. Villarreal  was required to start work at 5 A.M., and Defendant put up a bulletin board with all manager's pictures except his. On the 12th, Mr. Hedges threatened to "send [him] home permanently," and then assigned him trash duty. Shortly thereafter, Mr. Villarreal  discovered that Defendant was often scheduling him to work early mornings after scheduling him to work late the night before. On the 23rd, Mr. Hedges falsely accused Mr. Villarreal of stealing walkie-talkies.

32. On July 30, 2018, Mr. Villarreal had a meeting with Mr. Hedges where he told Mr. Hedges that he believed that he was being discriminated and retaliated against. Hedges responded angrily by saying that in raising this issue Mr. Villarreal was "attacking" him personally and that it "…pisses [him] off for [me] to even say that…"

33. On August 3, 2018, Mr. Hedges got within 1 inch of Mr. Villarreal's face and yelled at him for approximately 10 minutes. On the 16th, Hedges yelled at Mr. Villarreal again and prevented him from leaving Hedges' office.

34. On August 18, 2018, Mr. Villarreal had surgery to repair his work-related hernia. On the 27th, he was placed on work restrictions, and told that he would need to use oxygen and a wheelchair throughout the day, as well as be given time off for doctors' appointments. On the 30th, he was approved to use parking spaces reserved for disabled people. On the 31st, while in a small back office, a police officer hired by Defendant questioned him about his disability, and then fired his taser.

35. On September 4, 2018, Mr. Hedges and Molly Donahue informed Mr. Villarreal that he was being investigated for texting other employees, something that is routinely done by other workers. On September 24, Mr. Villarreal applied for medical leave, which he began at approximately the same time. During his leave, Ms. Donahue repeatedly called him about her investigation, and Defendant regularly alerted him about work related issues.

36. On November 1, 2019, Mr. Villarreal  had a phone call with Mr. Hedges to discuss his return to work. During the call, Hedges informed Mr. Villarreal that Defendant hired him an "assistant". However, this "assistant" was actually an asset protection agent, who was assigned to shadow Mr. Villarreal throughout the work day. None of his co-workers were monitored in this way.

37. On November 9, 2018, Mr. Villarreal returned to work. .After his return, Defendant paid him $85 of approximately $2600 that he was owed in paid time off. On the 11th, Ms. Greer informed him that his responsibilities for the deli and bakery had been taken away. On the 12th of the month, he discovered that Defendant removed him from one of its computer systems. That same day, his department held a conference call, but excluded him. In the following days, he discovered that he had also been locked out of the scheduling and hiring system, and was no longer allowed to participate in interviewing job candidates. On the 16th, he complained to Defendant that these actions are discriminatory and retaliatory. On the 29th, Mr. Hedges reprimanded him for not moving juice out of the dairy section, a task that he could not perform from his wheelchair.

38. On December 2-3, 2018, Mr. Villarreal was again out of work on medical leave. On the 4th, although it was Chanukah, he returned to work, even though his Christian peers are given off for Christmas. On the 13th, he discovered that his co-workers received food safety training and certification, but he was excluded from this process. That same day, Mr.

Hughes and Ms. Greer interviewed his co-workers and asked them questions about him, apparently as part of some sort of investigation.

39. Beginning in approximately February 2019, Mr. Villarreal was again placed on medical leave. He returned on March 18, and was informed that he had been moved to a different section of the store, and was now required to work overnight. On the 22nd, he complained to Defendant that these actions are discriminatory and retaliatory. The company took no action in response. On the 27th and 28th he again complained to Defendant that his new section is not wheelchair accessible, and requested a transfer back to his old department as an ADA accommodation. Again, Defendant took no action in response.

### FIRST CAUSE OF ACTION:
### DISABILITY DISCRIMINATION
### THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12101, *et seq.*

40. As a person with multiple serious medical conditions, Plaintiff has a disability as defined by law.

41. As demonstrated by his outstanding performance, Plaintiff was qualified for his position.

42. Plaintiff required reasonable accommodation in the form of medical leave, reinstatement, and job modification.

43. Defendant could accommodate Plaintiff's requested accommodations without undue hardship.

44. Defendant discriminated against Plaintiff by failing to accommodate his medical restrictions, assigning him undesirable tasks, removing his supervisory authority, and other adverse actions as described above.

45. Defendant failed to engage in the interactive process.

46. Defendant retaliated against Plaintiff after he requested accommodation and invoked his rights under the ADA.

47. Defendant subjected Plaintiff to a hostile work environment because of his request for accommodation and disability.

48. Defendant's actions were in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*.

49. Mr. Villarreal has been injured as a result of Defendant's actions or lack thereof.

**SECOND CAUSE OF ACTION:**
**FAMILY AND MEDICAL LEAVE**
**THE FAMILY AND MEDICAL LEAVE ACT**
**29 U.S.C. §§ 2601-2654; 29 U.S.C. § 2612(a)(1)**

50. Mr. Villarreal suffers from a serious health condition, and is a qualified employee under the Family and Medical Leave Act.

51. Mr. Villarreal availed himself of a protected right under the FMLA by requesting and taking medical leave.

52. In retaliation for Mr. Villarreal's request for medical leave, Defendant subjected him to adverse employment actions.

53. Defendant interfered with Mr. Villarreal's medical leave.

54. Defendant discriminated against Villarreal for taking medical leave.

55.  There was a causal connection between Mr. Villarreal's exercise of his rights under the FMLA and Defendant's adverse actions.

56.  Mr. Villarreal has been injured as a result of Defendant's actions or lack thereof.

## DEMAND FOR JUDGMENT

Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award him all relief as allowed by law, including, but not limited to, the following:

a.  Actual economic damages as established at trial;

b.  Compensatory damages including, but not limited to, those for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

c.  Punitive damages;

d.  Pre-judgment and post-judgment interest at the statutory rate;

e.  Attorneys' fees, costs and expenses; and

f.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 12th day of June, 2019.

s/ Paul Maxon
Paul Maxon (Atty. Reg. # 37251)
The Law Office of Paul Maxon, P.C.
4450 Arapahoe Avenue
Boulder, CO 80303
Telephone: (303) 473-9999
Fax: (303) 415-2500

E-mail: paulmaxon@maxonlaw.com
Attorney for Plaintiff Eluid Villarreal